**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CONNECTICUT LIGHT & POWER COMPANY D/B/A EVERSOURCE ENERGY, and EVERSOURCE ENERGY SERVICE COMPANY,<br><br>     *Plaintiffs*,<br><br>v.<br><br>NORTHLINE UTILITIES, LLC and USIC LOCATING SERVICES, LLC,<br><br>     *Defendants*. | No. 3:20-cv-00403 (MPS) |

**RULING ON MOTION FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION**

On March 28, 2018, Defendant Northline Utilities, LLC ("Northline") struck one of Connecticut Light and Power Company's ("CL&P's") underground transmission lines during an excavation. Plaintiffs CL&P and Eversource Energy Service Company (collectively, "Eversource") then commenced this lawsuit to recover for the damage to the transmission line. In addition to their claims against Northline, the plaintiffs allege that Defendant USIC Locating Services, LLC ("USIC") (1) negligently failed to identify and mark the underground transmission line before the excavation, and (2) breached its contract with Eversource Energy Service Company by failing to properly locate the line. USIC has moved for summary judgment on both claims. For the reasons explained herein, I deny USIC's motion.

## II.      FACTS AND PROCEDURAL HISTORY

The following facts are taken from the parties' Local Rule 56(a) Statements and exhibits.[1] All facts are undisputed unless otherwise indicated.

### A. Connecticut's Call Before You Dig Laws

Connecticut has enacted policies to facilitate safe excavation around underground utilities. ECF No. 81-1 ¶ 1; ECF No. 82-1 ¶ 1. One such program is Call Before You Dig ("CBYD"). Conn. Gen. Stat. § 16-345 *et seq.*; Conn. Agencies Regs. § 16-345. Before digging, excavators must contact a central clearinghouse, known as Call Before You Dig CT ("CBYD CT"), to provide information about the date, location, and type of excavation. ECF No. 81-1 ¶ 2; ECF No. 82-1 ¶ 2; Conn. Gen. Stat. § 16-349; Conn. Agencies Regs. § 16-345-2. CBYD CT then sends a "ticket" to utilities that may operate underground facilities near the excavation site. ECF No. 81-1 ¶ 2; ECF No. 82-1 ¶ 2; Conn. Agencies Regs. § 16-345-2.  By "the end of the second full day . . . after the day of notification to the central clearinghouse of a proposed excavation," utilities are required to "mark the approximate location of [any underground facilities]." Conn. Agencies Regs. § 16-345-3(b)(1); Conn. Gen. Stat. § 16-351. Tickets expire after 30 days. Conn. Agencies Regs. § 16-345-4(d). If an excavation has not been completed within that 30-day period, the excavator must again notify the clearinghouse, triggering the creation of a new ticket. ECF No. 87-2 ¶ 3; Conn. Gen. Stat. § 16-349.

---

[1] Local Rule 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." Local Rule 56(a)3 provides that "each denial in an opponent's Local 56(a)2 Statement[ ] must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." This Court is "under no 'obligation . . . to perform an independent review of the record to find proof of a factual dispute' if the non-moving party fails to designate specific facts showing a genuine dispute of material fact." *Chalco v. Belair*, 738 F. App'x 705, 709 (2d Cir. 2018) (summary order) (citations omitted); *accord Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (Court not required to assist parties who file deficient Local Rule 56 Statements by conducting "an exhaustive search of the entire record before ruling on a motion for summary judgment").

### B.  The Cover Agreement

Eversource, a Connecticut electric utility, has contracted with USIC to respond to CBYD tickets that may affect Eversource facilities. ECF No. 81-1 ¶ 4; ECF No. 82-1 ¶ 4. When a CBYD ticket is generated, USIC is obligated to respond to that ticket by locating and marking Eversource's facilities in accordance with the terms of the parties' contract (the "Cover Agreement"). *Id.*; *see also* ECF No. 74-1 at 37 ¶ 2.1 (contractual language: "[USIC] shall furnish all labor, and supervision thereof, tools, equipment . . . and transportation to complete in good and approved manner, work consisting generally of: performing the locating and working on [tickets] dispatched from CBYD . . . to [USIC], for locating and/or marking underground locations for all [underground facilities] in the area of the proposed excavation").

The Cover Agreement requires that USIC's locate technician (the "locator") visit the proposed excavation sites. ECF No. 74-1 at 39 ¶ 3.9. Once at the site, the locator must use "an electronic sounding device" and Eversource's records[2] to "identify the approximate location of [underground facilities]" and conduct a "50 [foot] sweep of the area." *Id.* at 39 ¶ 3.2; ECF No. 87-1 ¶ 2. The locator must also take date and time stamped videos of the locate site. ECF No. 74-1 at 39 ¶ 3.11; ECF No. 87-1 ¶ 5; *see also* ECF No. 81-6 at 54-55 (USIC Supervisor testifying that the locator is "supposed to" take one or two photos). If the locator does not find any underground facilities in the excavation area, he or she must "indicate so at the job site and/or pre-marked area." ECF No. 74-1 at 39 ¶ 3.9.  And if the locator is "unable to accurately identify and locate [Eversource's underground facilities]," he or she must "request such assistance from

---

[2] Eversource must provide maps of its underground electrical facilities, but those maps are "a guide only," and Eversource does not "assum[e] responsibility for [the maps'] accuracy . . . ." ECF No. 87-1 ¶ 6; ECF No. 74-1 at 40-41 ¶¶ 4.2, 4.4. USIC is "solely responsible for verifying the location of underground facilities with the use of underground sounding equipment." ECF No. 74-1 at 40 ¶ 4.2. If USIC discovers errors in Eversource's maps or other information Eversource provides, it is required to notify Eversource and provide corrected records. ECF No. 87-1 ¶ 3; ECF No. 74-1 at 39 ¶ 3.3.

[Eversource] as necessary to accomplish the [locate]." *Id.* at 39 ¶ 3.6; ECF No. 87-1 ¶ 4. USIC's work must "be completed in accordance with appropriate State Regulations." ECF No. 74-1 at 39 ¶ 3.4.

### C. Northline's Excavation

In 2018, United Illuminating engaged Northline to replace several of its telephone poles, including poles numbered 4982 and 881 in Fairfield, Connecticut. ECF No. 87-2 ¶ 4. It was during Northline's efforts to replace pole 4982 that it struck one of Eversource's underground transmission lines, causing the damages at issue in this lawsuit.

The CBYD Ticket

On February 10, 2018, Northline employee Charles Radley contacted CBYD to request a ticket, and CBYD generated Ticket Number 20180700047 (the "Ticket"). ECF No. 81-1 ¶ 10; ECF No. 82-1 ¶ 10; ECF No. 82-5.

Some of the location information listed on the Ticket was inaccurate. The address on the ticket—2602 Post Road, Fairfield, Connecticut—"was not the address where the actual dig took place." ECF No. 81-10 at 175 (CL&P's 30(b)(6) witness testifying that this fact is not in dispute); ECF No. 82-5 at 2 (ticket listing Post Road address). Radley admitted that United Illuminating had listed a different address on its work order. ECF No. 74-3 at 28, 30, 53-55. But he ultimately chose 2602 Post Road as the address, because he had difficulty entering the address from the work order into the CBYD web portal. *Id.* at 56 ("The way the [CBYD] ticket came up, that's the only way it would let me do it."); *id.* at 37 ("I had a lot of tough time trying to make that [CBYD] ticket out to get it where I thought it was right.").

When preparing the Ticket, Radley drew a red polygon around the supposed location of poles 4982 and 881 on Post Road. ECF No. 81-4 at 2. But the polygon did not contain either

pole. ECF No. 87-2 ¶ 11; ECF No. 74-3 at 33-36, 55 (Radley testifying that he later discovered the polygon did not include the poles). The CBYD system generated a latitude and longitude for the Ticket, which was located at the center of the polygon. ECF No. 81-6 at 20, 25-26. That latitude and longitude was approximately 710 feet from the location where the excavation would ultimately take place. *Id.* at 20-30; ECF No. 87-1 ¶ 14.

Finally, Radley provided some additional information about the location of the excavation site. He listed cross-streets,[3] and wrote "MARK 25 FT AROUND POLES 4982 AND 881" in the Remarks section of the Ticket. ECF No. 82-5; ECF No. 81-4. He also claims that he visited the site in person to put down stakes and mark the area with white paint. ECF No. 81-2 at 26; ECF No. 81-8 at 10 (photos of white paint); *see also* ECF No. 87-1 ¶ 16 (USIC admitting that Northline pre-marked the "location it actually conducted excavation"). The Ticket indicated that the site was marked. ECF No. 82-5 at 2. And the Ticket had Radley's contact information, so that utilities could contact him with any questions. ECF No. 87-2 ¶ 12.

<u>USIC's February 16 Inspection of the Site</u>

USIC locator Anthony Rogers was assigned to the Ticket, and he responded to it on February 16, 2018. ECF No. 87-2 ¶ 25; ECF No. 81-5 at 2. During his deposition, Rogers indicated that he did not recall anything about his February 16 inspection of the site (the "Locate"). ECF No. 81-9 at 53, 70, 74. But he did testify as to his general practices, including that he would usually park his vehicle, review the ticket and "any prints" (i.e., maps), and then

---

[3] The Ticket lists the cross-streets with Post Road as "River rd and Mill Hill rd," ECF No. 81-4 at 2, but it is unclear whether those cross-streets are correct. In a later investigation of the excavation, the Connecticut Public Utilities Regulatory Authority determined that the poles "were within this portion of Post Road between [the] intersections [indicated by the cross streets]." ECF No. 81-16 at 3. But the maps the parties have provided show only a River *Street*, not a River *Road*. *See* ECF No. 81-11. And these maps offer multiple possible locations for the intersection between Post Road and River Street. *See id.* at 2 (showing intersection between Post Road and River Street near the location of the poles); *id.* at 3 (same); *id.* at 4 (showing three intersections between River Street and Post Road, two of which are west of the poles, near Mill Hill Road, and one of which is near the poles).

exit his vehicle to do a visual inspection of the area and perform the locate. ECF No. 87-2 ¶ 33; ECF No. 81-9 at 23.

Northline and USIC agree that Rogers stopped at a location west of the two poles but within the red polygon Radley had drawn on the Ticket. ECF No. 87-2 ¶¶ 26-27. USIC Supervisor Frank Biagiarelli testified that USIC uses a fleet management system to track the GPS movements of each locator's car. ECF No. 81-6 at 35-36. If the locator is at the approximate latitude and longitude associated with the ticket when the ticket is closed, the system will place a green checkmark on the map. *Id.* at 37.

At 4:05 pm, Rogers closed out the Ticket and reported to Northline that the "excavation site [was] clear." ECF No. 81-5 at 27; *see also id.* at 3 (reporting times in CST). The fleet management system recorded a green checkmark for Rogers' vehicle on Post Road near the latitude and longitude listed on the Ticket, which, as noted, was approximately 710 feet west of poles 4982 and 881. ECF No. 81-11 at 2, 6; ECF No. 81-6 at 29-30. Biagiarelli testified that Rogers was "probably within about 50 feet of where that green checkmark was placed" when he closed the Ticket. ECF No. 81-7 at 28.

The parties disagree, however, as to how long Rogers spent performing the Locate. Northline claims that software on USIC vehicles records "how long [locators] stop at a particular location," and "Rogers spent approximately 2-3 minutes performing the locate for the Ticket." ECF No. 87-2 ¶¶ 29, 39. USIC denies that the system reliably tracks the length of a stop. *Id.*

In USIC's tracking system, Rogers indicated that he was "Locating" at 4:02pm and indicated that he was driving away from the site at 4:05pm. ECF No. 81-5 at 27. Locators are supposed to indicate that they are locating as soon as they get to the site and indicate they are driving when they are about to leave the site. ECF No. 81-6 at 73. But in practice, Biagiarelli

testified that those timestamps "would be more of a timeline of when [the locator] opened the ticket on the laptop . . . . [a]nd when he closed it on the laptop, not necessarily reflecting how long he was actually at the dig." *Id.* at 71. He speculated that at 4:02pm, Rogers "had already done all his investigative work . . . and then he said, oh, I got to open that ticket now and status it." ECF No. 81-6 at 72. And he pointed to evidence that Rogers had difficulty operating the system properly, including a large number of redundant entries at 4:02pm. *Id.* at 71-72 ("It looks like he was hitting some of the same buttons on the computer over and over again . . . . That may be explained by the fact that a new piece of software was installed . . . . It was a field of buttons that would appear on the screen that was kind of tricky for the guys to figure out how to use."); *see also* ECF No. 81-5 at 27-28 (showing redundant entries).

Northline and Eversource maintain that there is no evidence Rogers followed any of the required procedures during the Locate or that he even exited his vehicle. *See* ECF No. 87-1 ¶ 18; ECF No. 87-2 ¶ 41. Rogers did not create any videos or take any photos when he was performing the Locate, as required by the Cover Agreement, nor did he upload any photos or videos when closing the Ticket. ECF No. 87-2 ¶ 42. Biagiarelli, who spoke to Rogers after the excavation incident, testified that he was not sure whether Rogers got out of his vehicle at the locate site, because he was not aware of any photographs Rogers had taken of the site. ECF No. 81-6 at 39-40.

Further, USIC's practice was to paint the site with "NO ELECTRIC" when it found no underground electrical facility at a site. ECF No. 87-1 ¶ 11(e) (USIC admitting that this was its practice); ECF No. 87-2 ¶ 37 (USIC admitting that Rogers was aware of this practice); ECF No. 81-8 at 32 (Rogers' testimony). Rogers "did not paint 'no electric' at the address contained in the February 2018 ticket," 2602 Post Road. ECF No. 87-1 ¶ 18(h). And Eversource and Northline

employees found markings from other utilities at poles 881 and 4982, but no markings for electric. ECF No. 81-2 at 31 (Radley testifying that he found markings from other utilities at pole 4982); ECF No. 81-18 at 2 (Northline excavator reporting that only gas, water, and sewer lines were marked out); *see also* ECF No. 81-16 (Public Utilities Regulatory Authority report reaching the same conclusion). Franco Cristofaro, an Eversource Senior Project Manager who served as CL&P's 30(b)(6) witness, testified that there were "absolutely no markings . . . out there that would indicate that [Rogers] was even at the location." ECF No. 81-10 at 52.

The parties also disagree as to whether Rogers had to search for the specific poles referenced in the Ticket. ECF No. 87-1 ¶ 11(g); ECF No. 87-2 ¶ 28. USIC maintains that he was required to perform the Locate only at the address listed on the Ticket; Northline and Eversource disagree, pointing to the Remarks section of the Ticket listing the pole numbers, and the fact that Radley marked the site with white paint. *Id.*

Witnesses offered conflicting testimony about what information the locator should use to find an excavation site. Biagiarelli testified that the scope of the locate was defined by the "written text on the ticket" and the latitude and longitude associated with the Ticket. ECF No. 81-7 at 23-24; *see also id.* at 32 ("[T]he scope of the ticket was . . . at the place that the lat[itude] and long[itude] was on the ticket and defined by [the red polygon]"). When asked whether the locator was "expected to verify the location of the poles" using pole number information written on the Ticket, he said, "Not necessarily . . . . It would be a good confirmation that you are in the right place, but the latitude and longitude on the ticket and the cross streets, would be the primary indicator of the dig area." ECF No. 81-6 at 93. Biagiarelli also testified that the locator could use the excavator's white paint markings to locate the dig area. ECF No. 81-6 at 93. But he added that the locator did "[n]ot necessarily" need to look for the markings, because "quite often,

the ticket says that it is marked, but it is not. It can be weathered out, trafficked out, or never have been placed." ECF No. 81-6 at 132-33.

Rogers testified that when the written text on the ticket listed pole numbers, he would look for the specific poles.[4] ECF No. 81-9 at 44-45. He also looked for the excavator's markings. *Id.* at 43. If he arrived at the site and was unable to find the poles referenced in the Ticket, or if he did not see markings from the excavator, he would often call the excavator or his supervisor to verify that he was in the right place. *Id.* at 43, 45-46. But he did not call Radley when he was performing the Locate. ECF No. 87-2 ¶ 42.

Finally, Northline claims that even if Rogers was not obligated to find the specific poles, he still should have identified the 345kV underground transmission line owned by Eversource, which was "virtually directly" below the location where he stopped and which "crossed through the center of the polygon Radley drew on the Ticket." ECF No. 87-2 ¶ 32. Cristofaro testified that Eversource provided USIC with a map that shows an underground transmission line near the area where Rogers stopped his car. ECF No. 81-10 at 45 (discussing ECF No. 81-12 at 2); *see* ECF No. 87-2 ¶ 44. A copy of the map was accessible to Rogers in his vehicle. ECF No. 87-2 ¶ 44; *see also* ECF No. 81-12 (exhibit showing the map); ECF No. 81-6 at 121-22 (Biagiarelli's testimony). But Cristofaro also testified that the address on the Ticket, 2602 Post Road, "would not have presented a conflict" with Eversource's underground transmission lines, because it was "far outside the 25-foot radius that would be customary for USIC to mark." ECF No. 74-6 at 104.

When closing out a locate ticket, Rogers was expected to attach a photo of the relevant underground facilities map. ECF No. 81-9 at 28; ECF No. 81-10 at 132; ECF No. 87-1 ¶ 11(d);

---

[4] During the deposition, counsel for USIC objected to some of Rogers' testimony on the grounds that it was overly speculative. At times, Rogers indicated that he had difficulty remembering certain aspects of his work as a locator, since he no longer works at USIC. *See, e.g.*, ECF No. 81-9 at 76 (Q: "Any idea what [a blue circle on the map] signifies?" Rogers: "Probably where the address is at." Q: "Okay." Rogers: "I am guessing.  Like I said, I haven't seen this in years . . . .")

ECF No. 87-2 ¶ 19. Rogers did not attach any Eversource maps when closing the Ticket. ECF No. 87-2 ¶ 44; ECF No. 81-10 at 161 (Cristofaro's testimony that no map was uploaded).

A few minutes after closing the Ticket, Rogers stopped and idled on Post Road in the vicinity of pole 4982. ECF No. 87-2 ¶ 47; ECF No. 81-6 at 34, 41-42 (Biagiarelli's testimony); ECF No. 81-11 at 6 (fleet management system showing a yellow marker on Post Road, where Rogers stopped for 8 minutes starting at 4:14pm).

February 21 Excavation

Northline commenced excavation at pole 4982 on February 21, 2018. ECF No. 87-2 ¶ 49; ECF No. 81-8 at 4. Northline's excavator operator, Matthew Hertler, testified that he saw "tons" of markings from other utilities that responded to the Ticket, but did not see any electrical markings. ECF No. 87-2 ¶ 50. While drilling a hole for the new telephone pole at the site, Hertler struck what he believed was rock. *Id.* ¶ 51. He stopped excavation for the day, filled the hole, and planned to return on another day to continue the excavation. *Id.*

March 28 Excavation

On March 28, 2018, Northline conducted a second excavation near pole 4982 (the "March 28 Excavation"). ECF No. 81-1 ¶ 6; ECF No. 82-1 ¶ 6; ECF No. 81-17 at 109. By that date, the February 10 CBYD Ticket had expired. ECF No. 81-1 ¶ 10; ECF No. 82-1 ¶ 10. Under Connecticut law, Northline was required to submit a new locate request before commencing the March 28 Excavation. Conn. Gen. Stat. § 16-349. Doing so would have led USIC to conduct a second locate. ECF No. 81-1 ¶ 11; ECF No. 82-1 ¶ 11. Northline admits that it did not submit a second locate request. ECF No. 82-1 ¶¶ 8-9. Radley testified that at the time, he was not aware that CBYD tickets had to be renewed after 30 days. ECF No. 81-2 at 40.

During the March 28 Excavation, Northline made contact with one of Eversource's electrical facilities, allegedly causing damage "in excess of $2 million." ECF No. 81-1 ¶ 7; ECF No. 82-1 ¶ 7.

Under the Cover Agreement, when Eversource learns of damage to an underground facility, it must notify USIC, which will then "investigate the circumstances of the incident and provide a written report." ECF No. 74-1 at 42 ¶¶ 7.1-7.2. "If [USIC's] report of the cause of the incident conflicts with the [Area Work Center] reports or [Eversource's] review of the incident," USIC and Eversource must meet to attempt to reach agreement. *Id.* at 42-43 ¶ 7.5. Eversource will then "submit the appropriate report to CBYD," noting the cause of the incident. *Id.* at 43 ¶ 7.6. Paragraph 7.7 of the Cover Agreement states: "If this investigation determines that [USIC] failed to accurately respond to the [Ticket] as required by State Regulations, [USIC] shall be responsible for all costs and expenses incurred as a result . . . includ[ing] any third party claims or resulting liability litigation." *Id.* at 43 ¶ 7.7. The parties disagree as to which investigation is referred to in Paragraph 7.7: Eversource claims it refers to a "regulatory investigation," while USIC suggests that it refers to the USIC, Eversource, and Area Work Center reviews of the incident referenced in Paragraph 7.5. ECF No. 87-1 ¶ 9.

From the records the parties have submitted, it is unclear whether USIC and Eversource conducted a review of the incident. On August 2, 2018, however, the Connecticut Public Utilities Regulatory Authority ("PURA") issued a Notice of Violation regarding the March 28 Excavation and assessed a $15,000 fine. ECF No. 81-16 at 3-4. It determined that Eversource had violated Connecticut's CBYD regulations by failing to locate the transmission line. *Id.* PURA rejected an argument Eversource had raised that the "location of excavation was outside the scope of the [T]icket." *Id.* PURA's report pointed to evidence that (1) there was white paint "clear[ly] and

visibl[y]" indicating the "precise location of pole installation," (2) other utilities were able to find the excavation site, and (3) the 345kV transmission line "transverses directly through [the] polygon [Northline had] drawn on the map." *Id.* at 3.

USIC ultimately reimbursed Eversource for the $15,000 civil penalty. ECF No. 87-2 ¶ 54 (USIC admitting that it "reimbursed Eversource for the PURA civil penalty without disputing the payment," but stating that the reimbursement "is immaterial to the claims in this case").

### D. Procedural History

The plaintiffs' amended complaint alleges that (1) Northline's and USIC's negligence led to the damage to the underground electrical facilities (Counts One and Two), and (2) USIC breached its contract with Plaintiff Eversource Service (Count Three). ECF No. 54. USIC has also filed two cross-claims against Northline, which seek indemnification and apportionment for any liability USIC may incur as a result of this lawsuit. ECF No. 49. On May 4, 2022, USIC moved for summary judgment on all counts against it. ECF No. 74. Northline did not file a motion for summary judgment. Judge Haight transferred this case to me on May 8, 2024. ECF No. 94.

## III.   LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir.

2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## IV.   DISCUSSION

### A.   Breach of Contract Claim

First, USIC moves for summary judgment on Eversource's breach of contract claim, which alleges that USIC "fail[ed] to perform all of its work in accordance with the terms of the [Cover Agreement]." ECF No. 54 ¶ 85.

The elements of a breach of contract claim are "[1] the formation of an agreement, [2] performance by one party, [3] breach of the agreement by the other party, and [4] damages." *AGW Sono Partners, LLC v. Downtown Soho, LLC*, 343 Conn. 309, 322 (2022) (citation and internal quotation marks omitted). As "part and parcel of a party's claim for breach of contract damages," that party must also show causation, i.e., that it "sustained damages as a direct and proximate result of the defendant's breach." *Meadowbrook Ctr., Inc. v. Buchman*, 149 Conn. App. 177, 186-87 (2014) (citation and internal quotation marks omitted).

USIC admits that the parties formed an agreement but contends that Eversource cannot establish the other elements of breach of contract. ECF No. 87 at 3. However, USIC's summary

13

judgment briefs do not argue that Eversource failed to perform under the Cover Agreement, nor has it pointed to evidence of any breach by Eversource. So I will consider only whether there is sufficient evidence to warrant a trial as to the third and fourth factors, i.e., whether USIC breached the contract and whether any such breach caused Eversource to incur recoverable damages.

<u>Breach</u>

The Cover Agreement obligates USIC to perform a locate for the "area of [a] proposed excavation" only if a locate ticket is "dispatched from CBYD." ECF No. 74-1 at 37 ¶ 2.1. USIC argues that it did not breach this provision because "no locate ticket . . . issued from the CBYD" for the March 28 Excavation. ECF No. 74 at 22. But as USIC admits, a locate ticket was issued on February 10, 2018. ECF No. 81-1 ¶ 10. USIC was therefore obligated to perform a locate— and it attempted to do so on February 16, 2018. USIC has pointed to no provision of the Cover Agreement that absolves USIC of its obligation to perform its location duties if the excavator does not ultimately end up completing the excavation before the ticket expires.

There is sufficient evidence to allow a reasonable jury to find that USIC did not "perform all its work in accordance with the [Cover Agreement]" in responding to the February 10 Ticket. ECF No. 54 ¶ 85. Paragraph 3.11 of the Cover Agreement requires the USIC locator to take "[d]ate/time stamped videos" of the Locate site, ECF No. 74-1 at 39, and USIC admits that "Rogers did not create any videos [or] take any photos . . . in performing the [L]ocate," ECF No. 87-2 ¶ 42; *see also* ECF No. 81-6 at 39-40, 54 (Biagiarelli testifying that he was unaware of any photos Rogers had taken of the site); ECF No. 81-10 at 25-26, 100 (Cristofaro testifying that there were no photos or videos taken of the Locate).

Further, under Paragraph 3.9, if Rogers found no underground facilities at a site, he was required to "indicate so at the job site and/or pre-marked area." ECF No. 74-1 at 39. USIC admits that Rogers "did not paint 'no electric' at the address contained in the February 2018 Ticket," which it claims is the only area Rogers was obligated to inspect. ECF No. 87-1 ¶ 18(h). And there is additional evidence indicating that Rogers did not make markings at *any site*, including the excavation site. *See* ECF No. 81-10 at 52 (Cristofaro testifying that there were "absolutely no markings out there that would indicate that [Rogers] was even at the location"); ECF No. 81-18 at 2 (Northline excavator reporting that there were marks only for gas, water, and sewer); ECF No. 81-8 at 11 (photographs of the excavation site). A reasonable jury could conclude from this evidence that USIC violated Paragraph 3.9.

Further, a reasonable jury could find that Rogers did not stop long enough to perform the required 50-foot sweep of the area using an electronic sounding device. *See* ECF No. 74-1 at 39 ¶ 3.2. There is evidence that Rogers began locating at 4:02pm and drove away from the site at 4:05pm. ECF No. 81-5 at 27. While Biagiarelli speculated that Rogers might have waited to mark himself as locating until he had completed his investigation, ECF No. 81-6 at 72, a jury would not be required to credit Biagiarelli's theory. Indeed, Northline and Eversource point to other evidence that Rogers did not spend enough time at the site, including evidence that he failed to take any photos or videos, to paint "no electric markings," to contact Radley to discuss the inconsistent location information on the Ticket, or to identify the 345kV underground transmission line that allegedly ran near the location where Rogers stopped. *See* ECF No. 87-2 ¶ 42 (USIC admitting that Rogers did not call Radley); ECF No. 81-10 at 45 (Cristofaro's testimony regarding the location of the 345kV transmission line); ECF No. 81-6 at 123 (Biagiarelli testifying, based on map of transmission lines, that Rogers "would have been near

the intersection with Mill Hill Road . . . at about station 498 on the transmission line . . . ."); ECF No. 81-16 at 3 (PURA investigation concluding that the line "transverses directly through [the] polygon drawn on the map").

Thus, a genuine dispute of material fact exists as to whether USIC breached the Cover Agreement in responding to the February 10, 2018 Ticket.

<u>Causation</u>

I also conclude there is a genuine factual dispute about whether any breach by USIC of its duty with respect to the February 10, 2018 Ticket caused Eversource to incur recoverable damages.

USIC argues that it cannot be liable for damages from the March 28 Excavation because it had no duty with respect to that excavation. It is true that USIC had no locating or marking duties with respect to the March 28 Excavation, but it did have such duties with respect to the February 10 Ticket. So the question is whether any breach of those duties actually and legally caused the damages from the March 28 Excavation.

Eversource will prevail on this issue if it can prove that: "(1) the damages were reasonably foreseeable by [USIC] at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Meadowbrook Ctr.*, 149 Conn. App. at 186 (citation and internal quotation marks omitted); *see also West Haven Sound Dev. Corp. v. West Haven*, 201 Conn. 305, 319 (1986) ("[A] party may recover general contract damages for any loss that may fairly and reasonably be considered as arising naturally, i.e., according to the usual course of things, from such breach of contract itself." (citation,

internal quotations, and alterations omitted)). USIC does not contest that any damages can be shown with reasonable certainty, so I will assume they can be.

A reasonable jury could find that the damage to Eversource's underground transmission line was a "reasonably foreseeable" consequence of USIC's failure to comply with the Cover Agreement's required procedures for locates on February 16, 2018.  Indeed, it appears that one purpose of those provisions was to prevent damage to underground facilities. ECF No. 74-1 at 42 ¶¶ 7.1-7.9 (Cover Agreement provisions setting forth investigation procedures if "damage has occurred to an [underground facility]"). And the occurrence of the transmission strike two weeks after the ticket expired does not make the damage indisputably "so remote as not to be directly traceable to the breach." *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 526 (2d Cir. 2004). A two-week delay is not so large that USIC could not have caused the March 28 damages as a matter of law. A jury could find that it was reasonably foreseeable that an excavator would begin the dig in the 30-day window before the Ticket expired, and then complete it after the Ticket expired, while neglecting to create a new Ticket.

Likewise, a reasonable jury could find that the breaches were a substantial causal factor in the damage to the underground electrical line. For instance, the jury could conclude that if Rogers had followed the procedures required by the contract, he would have (1) found and marked the correct site, (2) identified the transmission line that allegedly ran near the address on the Ticket and notified Northline of that risk, or (3) uploaded photographs of the site he inspected, thus alerting Northline that he went to the wrong location. The evidence in the record does not mandate a conclusion that Eversource's failure to submit a new locate request was the sole cause of the injury or that it was an "unforeseeable intentional tort." *Barry v. Quality Steel Products, Inc.*, 263 Conn. 424, 438 n.16 (2003) (abandoning doctrine of "superseding cause"

only in cases where the intervening act is negligent and stating that "[o]ur conclusion does not necessarily affect those cases 'involving unforeseeable intentional tort[s]' that may break the chain of causation between the defendant's actions and the damages); *see* ECF No. 81-2 at 39-40 (Radley testifying that he did not know that the Ticket would expire after forty days, and was used to operating under New York law, which did not have the same requirement).

Because there is sufficient evidence to raise a material issue of fact as to whether USIC breached the Cover Agreement, and whether that breach caused foreseeable damages to Eversource, I deny Eversource's motion for summary judgment as to the breach of contract claim (Count Three).

### B.  Negligence Claim

USIC also moves for summary judgment on Count One of the amended complaint, which alleges that USIC was negligent in reporting that the excavation site was clear of any underground electrical facilities.

"To establish a claim of negligence, a plaintiff must demonstrate that the defendant was under a duty of care, that the defendant's conduct breached that duty, and that the breach caused an actual injury to the plaintiff." *Brooks v. Powers*, 328 Conn. 256, 272 (2018). USIC contends that it did not have a duty to mark the excavation site for the March 28 Excavation, because Northline did not "compl[y] with the statutory mandate that [it] 'again notify the central clearinghouse'" before performing the March 28 Excavation. ECF No. 74 at 8.

"Whether a duty exists is a question of law for the court, and only if the court finds that such a duty exists does the trier of fact consider whether that duty was breached." *Ruiz v. Victory Properties, LLC*, 315 Conn. 320, 328 (2015). "[T]he test for the existence of a legal duty of care

entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case." *Grenier v. Comm'r of Transp.*, 306 Conn. 523, 539 (2012) (internal quotation marks omitted). At the second step, Connecticut courts have recognized four factors "to be considered in determining the extent of a legal duty as a matter of public policy: (1) the normal expectations of the participants in the activity under review; (2) the public policy of encouraging participation in the activity, while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions." *Murillo v. Seymour Ambulance Association, Inc.*, 264 Conn. 474, 480 (2003).

I find that USIC had a duty to exercise reasonable care to prevent damage to Eversource's underground facilities while performing the location activities on February 16, 2018, and that this duty required it to take steps to avoid causing damage to transmission lines, even if that damage occurred after the Ticket expired. First, there is no question that a contractor in USIC's position, knowing what it knew or should have known, "would anticipate that harm of the general nature of that suffered was likely to result." *Grenier*, 306 Conn. at 539. Connecticut's CBYD regulations exist precisely to prevent the type of damage to underground facilities that occurred in this case. ECF No. 81-1 ¶ 1; ECF No. 82-1 ¶ 1. The fact that the transmission strike occurred about two weeks after the ticket expired does not excuse USIC from anticipating "harm of [that] general nature." *Grenier*, 306 Conn. at 539.

Public policy also supports extending USIC's liability to damages that occurred after the Ticket expired, at least under the circumstances of this case. I begin with the first factor, the

"normal expectations of the participants in the activity under review." *Murillo*, 264 Conn. at 480. "Connecticut's existing body of common law and statutory law relating to this issue," *Lawrence v. O & G Indus., Inc.*, 319 Conn. 641, 651 (2015), suggests that USIC had a duty to prevent the harm alleged here. Connecticut law requires utilities—or in this case, USIC on behalf of a utility—to "mark the approximate location" of underground facilities before an excavation. Conn. Gen. Stat. § 16-351. And it provides for civil penalties for failure to correctly mark facilities, even if no property damage or personal injury occurs, and without any exception for circumstances where another party was also negligent or violated the law. *Id.* § 16-356. Neither the CBYD statutes nor the accompanying regulations indicate that a utility should escape civil penalties just because its failure to inform the excavator of the approximate location of underground facilities did not result in harm until after the ticket expired. *See* Conn. Gen. Stat. §§ 16-351, 16-356. So Connecticut statutes suggest that USIC would have reasonably anticipated that it would be held liable if it failed to mark facilities.

As USIC points out, the CBYD statutes also require the excavator to contact the CBYD central clearinghouse again if it has not completed its excavation after 30 days, and Northline did not do so. So here, both USIC and Northline are accused of acting negligently and violating Connecticut law. But USIC should have anticipated that under circumstances such as these, it might be held liable for its own negligence, even if the excavator was also negligent. Connecticut is a comparative negligence state: where multiple parties are negligent, the fact finder must "allocat[e] the percentage of fault attributable to each [negligent] party." *Hackling v. Casbro Const. of Rhode Island*, 67 Conn. App. 286, 294 n.4 (2001). And in tort cases involving multiple negligent defendants, Connecticut courts have largely abandoned the concept of intervening or superseding cause, i.e., that the chain of causation for a negligence claim might be broken by "an

act of a third person or other force which by its intervention prevents the actor from being liable for harm to another." *Barry*, 263 Conn. at 434. In limiting the superseding cause doctrine, the Connecticut Supreme Court reasoned that "[i]t is inconsistent to conclude simultaneously that all negligent parties should pay in proportion to their fault . . . but that one negligent party does not have to pay its share because its negligence was somehow 'superseded' by a subsequent negligent act." *Id.* at 441-42. Under the first public policy factor, then, USIC should have expected that it could be held liable "in proportion to [its] fault," regardless of the subsequent negligence of other parties. *Id.*

Further, "the public policy of encouraging participation in the activity, while weighing the safety of the participants" supports holding USIC liable. *Murillo*, 264 Conn. at 480. The safety concerns here are significant: failure to properly mark utilities can result in not only property damage, but also death or serious injury for workers. *See* ECF No. 81-2 at 49 (Radley testifying that this incident was classified as a "near miss" because "[i]f the relays weren't the way it is, I would have people dead there"). And there is little risk of deterring utilities from participating in the CBYD system, because they are required to do so by state law. Of course, permitting liability for excavations on expired tickets might increase the cost of operating a utility company or of hiring contractors like USIC to perform locates. But utility companies also benefit when their facilities are not damaged during excavations, and that benefit may well exceed the added cost. I likewise find that the risk of increased litigation—the third public policy factor—does not outweigh the safety benefits of encouraging utility companies or contractors to be careful in marking underground facilities. Finally, the parties have submitted little evidence regarding the fourth factor, the "decisions of other jurisdictions," and I have been unable to find a comparable case from another jurisdiction. So I assign this factor no weight.

Because the general harm that occurred was foreseeable, and the public policy factors favor liability, I hold that USIC had a duty to take reasonable care to prevent damage to Eversource's facilities, even if the excavation that caused the damage was completed after the Ticket expired.

There is also a genuine dispute of fact about whether USIC breached its duty. USIC argues that it cannot be held liable for its performance during the Locate, because "the February Ticket is for an address approximately 700 feet (more than two football fields) away from the actual excavation location of the illegal March 28, 2018 Excavation transmission line strike." ECF No. 87 at 10.

But there is sufficient evidence for a reasonable jury to conclude that USIC was negligent in failing to find the poles referenced in the Ticket. The Ticket instructed the locator to mark 25 feet around poles 4982 and 881, ECF No. 82-5, and there is evidence that Rogers should have considered those instructions, ECF No. 81-7 at 23-24 (Biagiarelli testifying that the scope of the locate was defined, in part, by the "written text on the Ticket"); ECF No. 81-9 at 44-45 (Rogers testifying that where specific poles were listed on the Ticket, he would look for the poles); ECF No. 81-10 at 44 (Cristofaro testifying that "the protocol should have been to . . . try to find the pole numbers that were referenced on the ticket"). There is also evidence that the poles were marked with white paint, and that Rogers knew to look for such markings. ECF No. 87-1 ¶ 16 (USIC admitting that the excavation site was marked); ECF No. 81-5 at 2 (Ticket notifying USIC that the site was marked); ECF No. 81-9 at 43 (Rogers testifying that he looked for markings and would sometimes contact the contractor if he did not find markings at the site). And if Rogers was confused about the fact that the poles and markings were not at the address listed on the

Ticket, a jury could reasonably infer that he should have contacted Radley. *See* ECF No. 87-2 ¶ 12 (USIC admitting that Radley's contact information was on the Ticket).

Finally, even if Rogers was not obligated to find the poles listed on the Ticket, a jury could still find that he acted negligently. The record includes evidence that the underground transmission line ran through the area where Rogers actually stopped. *See* evidence cited *supra* at 15-16. So a jury could find that Rogers should have found that transmission line and notified Northline. And as discussed earlier, a jury could also reasonably find that Rogers negligently failed to follow the required procedures for a Locate, including uploading photos and videos, and that Northline therefore did not realize that he had gone to the wrong site. *See* discussion *supra* at 14, 17.

Thus, I find that a trial is warranted on Eversource's negligence claim.

## V.    CONCLUSION

For the reasons explained above, USIC's motion for summary judgment is denied.


IT IS SO ORDERED.


_____
/s/
Michael P. Shea, U.S.D.J.


Dated:  Hartford, Connecticut
        September 12, 2024